```
              UNITED STATES DISTRICT COURT
                DISTRICT OF NEW HAMPSHIRE
```

Martin Rouleau and Lisa
Rouleau

    v.                                    Civil No. 14-cv-568-JL
                                          Opinion No. 2015 DNH 084

US Bank, N.A., JP Morgan Chase
Bank, N.A., and Nationstar
Mortgage, LLC

## MEMORANDUM ORDER

This case involves the applicability of the implied duty of good faith and fair dealing to a residential mortgage, as well as vicarious liability under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq. ("RESPA"). Martin and Lisa Rouleau, having fallen behind on their mortgage payments, sought a mortgage loan modification from JP Morgan Chase Bank, N.A., which both owned and serviced the loan. Before JP Morgan took any action on the Rouleaus' modification application, it assigned their loan to US Bank, N.A. Nationstar Mortgage, LLC began servicing the loan on US Bank's behalf. The Rouleaus' efforts to discuss the application with Nationstar were met with silence until, abruptly--and without the Rouleaus having received a decision on their application--US Bank moved to foreclose the mortgage. The Rouleaus filed this action against JP Morgan, US Bank, and Nationstar, alleging that US Bank had breached the duty of good faith and fair dealing inherent in the mortgage, and that

all three defendants had violated the loss mitigation regulations promulgated by the Consumer Financial Protection Bureau pursuant to RESPA.  By dint of the Rouleaus' RESPA claim, this court has jurisdiction over this matter under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction).

US Bank has moved to dismiss the complaint.[1]  See Fed. R. Civ. P. 12(b)(6).  It argues that New Hampshire law does not recognize a mortgagee's refusal to consider, or even acknowledge, a loan modification application as a basis for a claim for breach of the duty of good faith and fair dealing.  Nor may it be held liable under RESPA, it argues, because the regulations allegedly breached govern the conduct of "servicers" only--which it is not --and it cannot be held vicariously liable for Nationstar's conduct.  As fully explained below, the court agrees with US Bank as to the first claim, but disagrees as to the second, and thus grants the motion in part and denies it in part.

## I.  **Applicable legal standard**

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff's complaint must allege facts sufficient to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v.

---

[1]Both JP Morgan and Nationstar answered the complaint rather than moving to dismiss.

Twombly, 550 U.S. 544, 570 (2007)).  In ruling on such a motion, the court must accept as true all well-pleaded facts set forth in the complaint and must draw all reasonable inferences in the plaintiff's favor.  See, e.g., Martino v. Forward Air, Inc., 609 F.3d 1, 2 (1st Cir. 2010).  The court "may consider not only the complaint but also facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice."  Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35 (1st Cir. 2009).  With the facts so construed, "questions of law [are] ripe for resolution at the pleadings stage."  Simmons v. Galvin, 575 F.3d 24, 30 (1st Cir. 2009).  The following background summary adopts that approach.

## II.  Background

In December 2004, the Rouleaus executed a promissory note in the amount of $259,000, secured by a mortgage on their residence at 34 Pease Lane in Rollinsford, New Hampshire.  The named lender and mortgagee was Chase Manhattan Mortgage Corporation.  The mortgage specified that, in the event of the Rouleaus' default and their failure to cure that default, Chase Manhattan "at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law."

Until 2011, the Rouleaus successfully made their payments on the loan.  In July of that year, however, Mrs. Rouleau experienced a sudden onset of illness that required her to leave her job.  This blow to the Rouleaus' household finances caused them to fall behind on their mortgage payments.  After unsuccessfully attempting to remedy their default, the Rouleaus contacted JP Morgan Chase Bank, NA--which, as the successor to Chase Manhattan, both owned and serviced their mortgage--to seek a loan modification.

The Rouleaus submitted an application for a modification to JP Morgan in February 2014.  In May, a JP Morgan employee sent a letter to Mrs. Rouleau confirming receipt of the application, and informing her that JP Morgan would "contact you by June 12, 2014, to let you know the option(s) for which you're eligible and next steps . . . ."  Having heard nothing from JP Morgan by that date, Mr. Rouleau called JP Morgan and was informed by a JP Morgan representative that the application was complete and that no further information was required.

On June 30, 2014, JP Morgan assigned the Rouleaus' mortgage to US Bank, N.A., and Nationstar Mortgage, LLC began servicing the loan on US Bank's behalf the following day.  Not long thereafter, Nationstar wrote to Mrs. Rouleau, informing her that "[i]f you are in the process of applying for or providing

4

information related to a workout (including modifications) with [JP Morgan], we anticipate that your information will soon be transferred to Nationstar Mortgage, but please feel free to contact us to verify we have what we need to move forward."  Mr. Rouleau attempted to call Nationstar to inquire about the status of the modification application twice in August 2014, but each time, he was put on hold for over an hour, and eventually hung up without having spoken to a Nationstar representative.  Following guidance he received in a letter form Nationstar, Mr. Rouleau then opened an online account with Nationstar in order to improve communication regarding the modification application.

    The Rouleaus heard nothing from either US Bank or Nationstar until November 2014, when US Bank's counsel sent them a notice informing them that it had scheduled a foreclosure sale of the mortgaged property for the following month.  Roughly one week before the sale was scheduled to take place, the Rouleaus filed this action in Strafford County Superior Court seeking injunctive relief under N.H. Rev. Stat. Ann. § 479:25; the Superior Court issued a temporary restraining order enjoining the foreclosure later that day.  At about the same time, the Rouleaus submitted a revised modification application to Nationstar.  A month later, after US Bank removed the case to this court, Nationstar informed the Rouleaus that it had approved them for a trial modification.

5

**III.  Analysis**

As mentioned at the outset, the Rouleaus assert two claims against US Bank:  a claim alleging that it has breached the duty of good faith and fair dealing inherent in the mortgage, and a claim that it is liable for Nationstar's alleged violations of the regulations implementing RESPA.  US Bank has moved to dismiss both claims.  Although the court agrees with US Bank that the Rouleaus' complaint fails to state a claim that it has breached the duty of good faith and fair dealing, it cannot reach the same conclusion as to the Rouleaus' RESPA claim.

    **A.  Count 1 - Breach of duty of good faith and fair dealing**

In Count 1 of their complaint, the Rouleaus advance a claim that has become de rigueur among those challenging foreclosures in this court.  They allege that by "proceeding with a foreclosure without first considering the Rouleaus' application for a loan modification," US Bank "evade[d] the Rouleaus' justified expectation that [it] would refrain from foreclosure while more equitable alternatives remained under consideration," and thus breached the duty of good faith and fair dealing contracting parties owe one another.  Am. Compl. (document no. 7) at ¶ 57.  Given the almost universally poor success with which such claims have met in this court, it should not surprise the

Rouleaus to learn that their view finds little or no support in the applicable law.

First, some brief background: under New Hampshire law, every contract contains "an implied covenant that the parties will act in good faith and fairly with one another." Birch Broad., Inc. v. Capitol Broad. Corp., Inc., 161 N.H. 192, 198 (2010). This duty of good faith and fair dealing takes several forms, which can be grouped into three categories, "the first dealing with conduct in contract formation; the second addressing termination of at-will employment contracts; and the third dealing with the limitation of discretion in contractual performance." Great Lakes Aircraft Co. v. City of Claremont, 135 N.H. 270, 293 (1992). The Rouleaus' claim falls into the third of these categories. Whether a plaintiff has sufficiently alleged a breach of that particular duty

> turns on three key questions: (1) whether the agreement allows or confers discretion on the defendant to deprive the plaintiff of a substantial portion of the benefit of the agreement; (2) whether the defendant exercised its discretion reasonably; and (3) whether the defendant's abuse of discretion caused the damage complained of.

Moore v. Mortg. Elec. Reg. Sys., Inc., 848 F. Supp. 2d 107, 129 (D.N.H. 2012) (internal quotation marks and citation omitted).

The Rouleaus' claim founders at the very first inquiry. As another judge of this court has previously explained, New

7

Hampshire Supreme Court case law makes clear "that contractual discretion can be exercised in a way that violates the duty of good faith and fair dealing only if a promise is subject to such a degree of discretion that its practical benefit could seemingly be withheld." Milford-Bennington R. Co., Inc. v. Pan Am Rys., Inc., 2011 DNH 206, at 11 (Barbadoro, J.) (quoting Centronics Corp. v. Genicom Corp., 132 N.H. 133, 144 (1989)) (internal quotation marks and alterations omitted), aff'd, 695 F.3d 175 (1st Cir. 2012).  That degree of discretion

> arises whenever a legal directive or contract term is indeterminate because it fails to identify a single specific action that is legally permitted, prohibited, or required under the circumstances.  When expressly agreed contract terms leave a party with discretion, one party might act in performance of the contract, believing the act to be allowed while the other believes that act to be disallowed.  In the ensuing dispute, no resolution may be possible based solely on the agreed contract terms.

Id. (quoting Steven J. Burton & Eric G. Andersen, Contractual Good Faith, § 2.3.2.1 at 45 (1995)).  So, for example, in Griswold v. Heat Inc., 108 N.H. 119 (1967)--the "seminal case on the implied obligation of good faith performance," Centronics, 132 N.H. at 141--the New Hampshire Supreme Court held that a contract to pay $200 per month for "such services as [the counterparty], in his sole discretion, may render," should, consistent with the duty of good faith, be read to require the counterparty to provide some services.  Griswold, 108 N.H. at

8

123-24. Even though the contract "expressly conferred discretion to do nothing at all" on the counterparty, the duty of good faith denied it "the right to frustrate the other party's expectation of receiving some reasonable level of performance." Centronics, 132 N.H. at 141.

The reverse implication of all this is that "the duty of good faith and fair dealing ordinarily does not come into play in disputes" where "the underlying contract plainly spells out both the rights and duties of the parties and the consequences that will follow from a breach of a specified right." Milford-Bennington R. Co., 2011 DNH 206 at 11. That effectively sounds the death knell for the Rouleaus' claim. In arguing that the mortgage gives US Bank the discretion to withhold its "practical benefit," the Rouleaus point to Paragraph 22, which states that if the Rouleaus default on their payment obligations and fail to cure that default, US Bank "<u>at its option</u> may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law" (emphasis added). The Rouleaus zero in on the emphasized language, contending that this language permits US Bank to choose whether it proceeds with foreclosure (which, they say, would deprive them

of the benefit of their contract²) or takes an alternative tack. Yet in their myopic focus on this language, the Rouleaus lose sight of the larger picture: Paragraph 22 does set out "a single specific action that is legally permitted." It unambiguously permits US Bank to foreclose after they default. There can be no disagreement or confusion as to whether the mortgage allows or disallows that action. So, while Paragraph 22 does confer some discretion on US Bank in deciding whether or not to proceed with foreclosure, it is not so lacking in clarity as to provide the fodder for a successful claim for breach of the implied duty of good faith and fair dealing.

---

²This court is not unsympathetic to the plight of borrowers living in mortgaged homes under threat of foreclosure. But the court harbors serious doubt about whether a lender that proceeds with foreclosure in the face of the borrowers' default can truly be said to have deprived the borrowers of the benefit of their contract. As another judge of this court recently explained, the benefit borrowers receive from a mortgage loan agreement is the loaned funds, and where, as here, the borrowers receive the loan, that "means, necessarily, that they received the full value of their agreement." Douglas v. U.S. Bank Nat. Ass'n, 2013 DNH 071, at 12 (McCafferty, J.). "That the [borrowers] later found themselves unable to repay their loan, and may have benefitted from a loan modification, does nothing to undermine the fact that, in the first instance, they received the loan they bargained for, which was the full value of their agreement." Id. at 12-13; cf. also Pruden v. CitiMortgage, Inc., 2014 DNH 115, at 15 (under a note and mortgage, the lender's "only promised performance was to lend [the borrower] a sum of money"; where the borrower had received that money, she could not maintain a claim for breach of the implied duty because the lender was no longer "in a position to deprive [the borrower] of any of the agreement's value, much less a substantial portion of it"). It is not necessary, however, to reach that issue here.

10

Put simply, Paragraph 22 plainly spells out US Bank's right to accelerate the loan and proceed with foreclosure in the event of the Rouleaus' failure to hold up their end of their bargain. As this court has held time and again, a party does not breach the duty of good faith and fair dealing simply by "invok[ing] a specific, limited right that is expressly granted by an enforceable contract." Milford-Bennington R. Co., 2011 DNH 206 at 12; see also, e.g., Moore, 848 F. Supp. 2d at 129 ("[P]arties generally are bound by the terms of an agreement freely and openly entered into, and the implied covenant does not preclude a contracting party from insisting on enforcement of a contract by its terms, even when enforcement might operate harshly or inequitably.") (quoting Olbres v. Hampton Co-op. Bank, 142 N.H. 227, 233 (1997); internal quotation marks omitted). That is to be expected, for one of the functions of the duty of good faith and fair dealing "is to prohibit behavior inconsistent with the parties' agreed-upon common purpose and justified expectations," Birch Broad., 161 N.H. at 198, and where, as here, a contract expressly grants a party the right to respond in a particular way to the counterparty's breach, any expectation that the party will not respond in that way can only be characterized as unjustified.

Indeed, if this court were to conclude that the implied duty of good faith and fair dealing operates in the manner the

Rouleaus urge, it would actually <u>frustrate</u> the parties' agreed-upon purposes and their justified expectations--or, at the very least, those of US Bank.  As the Rouleaus themselves recognize, a lender's purpose in entering a loan agreement is "to obtain a rate of return on the money lent."  Pls.' Memo. (document no. 14-1) at 15.  More specifically, in entering such an agreement, the lender's purpose and expectation is to earn a return consistent with the interest rate set forth in the loan documents, on the schedule set forth in those documents.

Yet if, as the Rouleaus argue, a lender must consider a borrower's request for a modification before it may foreclose (even in the absence of any requirement to that effect in the text of the mortgage itself), a borrower who is disinclined to honor the payment schedule and interest rate to which he or she agreed, or simply incapable of keeping up with them, can cease making payments and deny the lender the right to recoup its losses through foreclosure of the security until it has considered the borrower's request for a lower interest rate, a different payment schedule, or even--as is the case with some modifications--a reduction in the principal amount.  In so doing, the borrower, who will have already received the benefit of the lender's performance under the contract (i.e., the loan itself, <u>see</u> n.2 <u>supra</u>), can attempt to renegotiate the terms of his or

12

her own performance under the contract.  In short, the Rouleaus' desired result would permit them, and other borrowers in comparable situations, to deprive their counterparty of "a substantial portion of the benefit of the agreement"--the very harm the implied duty of good faith and fair dealing is intended to combat.

Nothing in the mortgage or in the Rouleaus' memorandum persuades the court that New Hampshire law countenances such a result.  Indeed, in support of their broad conception of the duty of good faith and fair dealing, the Rouleaus cite only a single, twenty-year-old case from this court.  See Crowley v. F.D.I.C., 849 F. Supp. 124 (D.N.H. 1994).  While Crowley admittedly can be read to support the Rouleaus' position, the holding of that case is not entirely clear from the court's opinion--nor is it, in any event, binding on this court.[3]  For the reasons set forth above, Count 1 is dismissed.

---

[3]It bears noting, moreover, that in a recent unpublished opinion, the New Hampshire Supreme Court itself cast doubt on the proposition that the duty of good faith and fair dealing requires a lender to consider a borrower's modification applications.  See Sovereign Bank, N.A. v. Bosse, No. 2014-0398 (N.H. Dec. 5, 2014) (slip op.).

### B.   Count 3 - RESPA

RESPA regulates the conduct of "servicers" of federally related mortgage loans. A "servicer," the statute explains, is "the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan)," 12 U.S.C. § 2605(i)(2); "servicing," in turn, is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan," id. § 2605(i)(3). Servicers must, in addition to adhering to certain other requirements, comply with the regulations promulgated by the Consumer Financial Protection Bureau. Id. § 2605(k)(1)(E).

Those regulations mandate, among other things, that a servicer promptly review any loss mitigation application it receives 45 days or more prior to a foreclosure sale, and notify the borrower within five days of receipt whether the application is complete or incomplete and, if incomplete, what information is necessary to complete it. 12 C.F.R. § 1024.41(b)(2). Within thirty days of receiving a complete application, the servicer must evaluate the borrower for any loss mitigation options and notify the borrower of what options, if any, are available. Id.

14

§ 1024.41(c)(1). While the servicer is reviewing the borrower for a modification, it may not (with some exceptions) initiate or conduct a foreclosure sale. Id. §§ 1024.41(f)(2), (g). A servicer to whom servicing of a mortgage loan is transferred while a loss mitigation application is pending must maintain policies and procedures "reasonably designed to ensure that the servicer can . . . identify necessary documents or information that may not have been transferred by a transferor servicer and obtain such documents from the transferor servicer." Id. § 1024.38(b)(4). RESPA provides that "[w]hoever fails to comply with" these requirements may be held liable to the borrower. 12 U.S.C. § 2605(f); see also 12 C.F.R. § 1024.41(a).

The Rouleaus claim that Nationstar, as their servicer, violated some or all of these requirements. They further assert that US Bank, as Nationstar's principal, may be held vicariously liable for Nationstar's transgressions. In moving to dismiss, US Bank notes that it is not itself a servicer (which the Rouleaus concede) and challenges the proposition that RESPA recognizes vicarious liability of mortgagees for the acts of servicers in their employ. That proposition, however, finds ample support in the law, so US Bank's argument cannot carry the day.

As a statute that provides a remedy for a defendant's breach of a duty created by and defined in the statute, RESPA creates "a

15

species of tort liability." City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 709 (1999) (holding that because 42 U.S.C. § 1983 "provides for relief for invasions of rights protected under federal law," claims under that statute "sound in tort"); see also Curtis v. Loether, 415 U.S. 189, 195-96 (1974) (where a statute "defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach," an action under the statute "sounds basically in tort").  The United States Supreme Court has long assumed that "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules," and consequently, that its statutorily-created torts "incorporate those rules." Meyer v. Holley, 537 U.S. 280, 285 (2003).  And "[i]t is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." Id.  It follows that unless Congress has "expressed a contrary intent" in RESPA, this court must infer that "ordinary rules [] apply" to that statute. Id. at 287; see also Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991) ("[W]here a common-law principle is well-established, . . . the courts may take it as given that Congress has legislated with an expectation that the principle

will apply except when a statutory purpose to the contrary is evident.").

US Bank has identified no statutory language that would support a conclusion that the "ordinary rules" of vicarious liability do not apply to RESPA, nor has it cited a single case supporting such a conclusion.[4]  The bulk of its argument is instead devoted to advancing the undisputed assertion that it is not a "servicer" under RESPA's definition of that term.  Whether or not US Bank qualifies as a servicer is, however, irrelevant, because (as already mentioned) RESPA does not limit liability to servicers, but provides that "[w]hoever" violates a statutory requirement may be held civilly liable.  Cf. Wadlington v. Credit Acceptance Corp., 76 F.3d 103, 108 (6th Cir. 1996) (principal could not be held vicariously liable under Fair Debt Collection Practices Act, as that statute imposes liability only on a "debt collector").

---

[4]In fairness, this court has been unable to locate a single case that directly addresses the issue and takes a position one way or the other.  Most courts faced with claims seeking to hold a mortgagee vicariously liable under RESPA for a servicer's acts in contravention of the statute have disposed of those claims on grounds other than the unavailability of vicarious liability. See, e.g., Nogle v. Sand Canyon Corp., No. 12-cv-23-S, 2012 WL 4857772, at *7 (D. Wyo. Oct. 11, 2012); Fullmer v. JPMorgan Chase Bank, NA, No. 09-cv-1037, 2010 WL 95206, at *5-6 (E.D. Cal. Jan. 6, 2010); Consumer Solutions REO, LLC v. Hillery, 658 F. Supp. 2d 1002, 1013-14 (N.D. Cal. 2009).

Although US Bank purports to find some support for its position in the definition of "servicer" as "including the person who makes or holds a loan if such person also services the loan," 12 U.S.C. § 2605(i)(2), the court fails to see the significance of that definition. All this language accomplishes is to make clear that a mortgagee or noteholder that services its own loan is bound by the same statutory and regulatory requirements that apply to servicers acting on behalf of other entities. It does not shed any light on whether a mortgagee or noteholder that <u>does not</u> service its own loan can be held liable where the servicer acting on its behalf fails to abide by those requirements.

So the record before the court fails to reveal any statutory, regulatory, or judicial indication that RESPA does not incorporate traditional tort rules of vicarious liability.[5]  On

---

[5]In their memorandum opposing US Bank's motion, the Rouleaus suggest that a bulletin issued by the Consumer Financial Protection Bureau affirmatively shows that RESPA incorporates the concept of vicarious liability, in that it contains the following cautionary language:

> [T]he mere fact that a supervised bank or nonbank enters into a business relationship with a service provider does not absolve the supervised bank or nonbank of responsibility for complying with Federal consumer financial law to avoid consumer harm. . . . Depending on the circumstances, legal responsibility may lie with the supervised bank or nonbank as well as with the supervised service provider.

CFPB Bulletin No. 2012-03 (C.F.P.B. April 13, 2012), available at http://files.consumerfinance.gov/f/201204_cfpg_bulletin_service-providers.pdf.  Given the guarded language the Bulletin employs,

this record, applying the standard discussed above, the court must conclude that RESPA does, in fact, incorporate those rules (although it is open to revisiting that conclusion in a different procedural context if US Bank is able to identify some evidence in the statutory language evincing a Congressional intent to the contrary).  As US Bank does not dispute that Nationstar was its agent with respect to the servicing of the Rouleaus' mortgage, or that the complaint's allegations are sufficient to state a claim that Nationstar violated RESPA, the court denies its motion to dismiss Count 3.

### IV.  Conclusion

For the reasons set forth above, US Bank's motion to dismiss[6] is GRANTED IN PART and DENIED IN PART.  Count 1 is dismissed.  All other counts remain pending against the defendants at whom they are directed.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  April 17, 2015

---

however--stating that, "depending on the circumstances," legal responsibility for an agent's conduct "may lie" with a bank--and the absence of any specific mention of RESPA anywhere in the Bulletin, this passage is of no use in determining whether vicarious liability is available under that statue.

[6]Document no. 10.

cc: Stephanie Anne Bray, Esq.
    John S. McNicholas, Esq.